## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| SANDRA WINSTEAD, ) | |
| ) | No. 13 CV 7320 |
| Plaintiff, ) | |
| ) | |
| v. ) | Magistrate Judge Young B. Kim |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | June 30, 2015 |
| Defendant. ) | |

## MEMORANDUM OPINION and ORDER

Sandra Winstead claims that she became disabled on November 2, 2008, from a combination of impairments including post-traumatic stress disorder, bipolar disorder, degenerative disc disease of the lumbar spine, and obesity. After the Appeals Council declined to review the administrative law judge's ("ALJ") most recent decision denying benefits to Winstead, she filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross motions for summary judgment. For the following reasons, Winstead's motion is denied, the Commissioner's motion is granted, and the final decision of the Commissioner is affirmed:

### Procedural History

Winstead applied for Title II Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") on September 16, 2009, claiming a disability onset date of November 2, 2008. (Administrative Record ("A.R.") 148.) Winstead's application was initially denied on February 3, 2010, and again upon

reconsideration. (Id. at 148.) After an ALJ issued an unfavorable decision for Winstead on March 10, 2011, (id. at 148-59), the Appeals Council remanded the case for further proceedings, (id at 166). On remand, a different ALJ held a second hearing on July 23, 2012, and again issued a decision denying benefits on August 29, 2012. The Appeals Council denied Winstead's request for review, (id. at 1-3), making the ALJ's decision the final decision of the Commissioner of the Social Security Administration. *See Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Winstead filed this action on October 11, 2013, seeking judicial review, *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, (R. 8); *see* 28 U.S.C. § 636(c).

## Facts

Winstead's life has not been easy. Her early childhood was marred by her parents' drug and alcohol abuse, which eventually led to her removal from their care. (A.R. 628.) Moving from foster home to foster home, Winstead was subjected to sexual and psychological abuse as a young child. (Id.) But things got worse: after returning to live with her parents at the age of eight, Winstead bore witness as her mother shot and killed her father. (Id.) After her father's death, Winstead reentered foster care, where she remained until her emancipation. (Id.) But in spite of these extraordinarily sad circumstances, Winstead is raising two children— one of whom is disabled, and for whom she is the representative payee—as a single mother, and has amassed a plethora of work experience in various trades as a regional truck driver, forklift operator, factory laborer, inspector/packer, nursing

home aide, telemarketer, gas station attendant, assembly-line worker, and roofer. (Id. at 60.) But Winstead admits that she was fired from many of her prior jobs, usually for absenteeism. (Id. at 71.) Then, in November 2008 at the age of 33, Winstead claims that she became unable to work because of a disabling combination of mental and physical impairments. She supplied documentary and testimonial evidence in support of her claim.

## A. Medical Evidence

Broadly characterized, Winstead's mental health records demonstrate that she suffers from anxiety, depression, and bipolar disorder and that these conditions wax and wane in severity. Among the earliest medical evidence documenting Winstead's anxiety is an August 2008 visit at a family practice medical clinic where she reported anxiety and panic attacks that she attributed to her then-husband's infidelity. (A.R. 615.) In November 2008, the time at which Winstead alleges her disability began, she returned for treatment for continued anxiety and panic attacks, and was prescribed Cymbalta and Xanax for depression and anxiety. (Id. at 611.) But in May 2009, Dr. Philomena Francis certified that Winstead was "found to be in good physical and mental health." (Id. at 623.) Yet, that same month, another treating source indicated that Winstead had "severe anxiety[,] uncontrolled." (Id. at 598.) By February 2010 Winstead reported to her doctors that her medication had lowered her anxiety, but then a month later she reported that her anxiety was being exacerbated by family medical stress. (Id. at 914.) And in December 2010, Winstead was "demanding nothing less than Xanax" from

Dr. Atul Sheth and told him that she was attempting to obtain disability payments. (Id. at 876.) Dr. Sheth noted that Winstead had been accused of selling her prescription drugs. (Id.)

Winstead's evaluations for psychiatric disability produced discordant results. In late December 2009, Winstead underwent disability testing before Dr. Mark Langgut, a licensed clinical psychologist. (Id. at 625-30.) According to Dr. Langgut, Winstead exhibited thought processes of normal speed but poor coherence and opined that "her arithmetic skills appear to inhibit her ability adequately to mete out those funds that might be awarded to her." (Id. at 630.) But Dr. Lionel Hudspeth, in performing a residual functional capacity ("RFC") assessment in January 2010, found that Winstead's descriptions of her symptoms were only "partially credible" and that her mental disorders caused her to have only mild restrictions in her activities of daily living, moderate restrictions in maintaining social function, and moderate restrictions in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Id. at 641.) Dr. Hudspeth also observed that Winstead "would be best served by having work assignments requiring no contact with the public and minimal contact with coworker[s] and supervisor[s]." (Id. at 647.) Dr. Ernst Bone reviewed the decision of Dr. Hudspeth and agreed with his determination in July 2010. (Id. at 837.) And in March 2011, an RFC assessment conducted by Dr. Michael Cremarius revealed only mild limitations for all of Winstead's disabilities and only for a six-month period. (Id. at 1028.)

In contrast, Joan Hallam, a social worker and registered nurse with North Central Behavioral Health Systems, completed a "Medical Source Statement" form for Winstead in May 2010 in which she opined that Winstead is "unable to meet competitive standards" for unskilled work in all 19 categories for which she was evaluated, including such abilities as "[c]arry out simple instructions" and "[u]nderstand and remember very short and simple instructions." (Id. at 731.) According to Nurse Hallam, Winstead has marked limitations in all three paragraph B criteria and has experienced four or more episodes of decompensation. (Id. at 733.) Nurse Hallam also concluded that Winstead has a "complete inability to function independently outside the area of one's home." (Id.)

Winstead also presented medical documentation of her back pain, which she has experienced at least since 2002. In September 2009 she sought treatment for back pain and an MRI revealed degenerative disc disease with a disc extrusion. (Id. at 570.) From then on, Winstead has intermittently sought treatment for her back pain in the form of pain medication and spinal injections. In February 2010 Winstead began a tripartite course of cortisone injections from Dr. Upendra Sinha that ended a month later. (Id. at 673, 765, 666.) In April 2010 Winstead sought treatment for back pain from Dr. Robert Prince, during which time she admitted to marijuana use and claimed that only Vicodin would alleviate her pain symptoms. (Id. at 803.) From 2010 to 2012, Winstead sought treatment for her back pain from numerous different providers: she continued to seek pain treatment and spinal injections from Dr. Sinha and Dr. Prince at St. Mary's Hospital, (id. at 800-01,

1081), and Dr. Deofil Orteza at St. Margaret's Hospital, (id. at 1327).  Dr. Sinha noted that he would prefer not to operate on Winstead, a decision he at least partly based upon her obesity.  (Id. at 1174.)

In March 2012, acting on a tip from a caller claiming to be Winstead's fiancé, Joan Luckey, a nurse practioner at Parkview Family Practice, discovered that Winstead was filling Vicodin prescriptions from her, Winstead's gynecologist, and from Dr. Sinha within the same two-week period.  (Id. at 1351.)  The caller claimed that Winstead was not taking her medications, but was instead selling or trading them for marijuana.  Nurse Luckey notified Winstead's other medical providers of this discovery.  (Id.)  In August 2012 Winstead went to an emergency room complaining of hip pain related to a fall, seeking pain medication.  (Id. at 1428.) Dr. Asamonja Roy referred Winstead for treatment at a pain clinic.  (Id. at 1432.)

In January 2011 Dr. Julio Pardo performed an RFC assessment and determined that Winstead can occasionally lift 50 pounds, frequently lift 25 pounds, and both stand and sit for six hours in an eight-hour day.  (Id. at 650.)  Although Dr. Pardo noted that Winstead suffers from chronic pain, he placed hardly any restrictions on her, finding that she can stoop or crouch only occasionally but is otherwise unrestricted in her postural limitations.  (Id. at 651.)  In September 2011 Dr. Charles Kenney performed another RFC assessment in which he determined that Winstead has the ability to lift up to 20 pounds occasionally and 10 pounds frequently, but can stoop and crouch only occasionally.    (Id. at 1033-39.) Dr. Kenney determined that Winstead is able to stand for two hours and sit for six

hours each work day.  (Id. at 1033.)  He also found Winstead's complaints about constant pain and difficulty bending, stretching, and lifting heavy objects to be credible.  (Id. at 1039.)

## B.    Winstead's Hearing Testimony

Winstead's testimony about her abilities was not optimistic.  She testified that although she has a driver's license, she has difficulty driving because she tires easily and becomes anxious behind the wheel.  (A.R. 52.)  She claimed that she becomes confused when attempting to perform tasks with multiple steps, (id. at 87), and that in prior factory jobs, her inability to concentrate caused her to fall behind in her work, (id. at 88).  After prompting by her attorney, Winstead added that her troubled childhood continues to affect her mental condition.  (Id. at 75.)  According to Winstead, she is unable to get out of bed at least three days per week because of "severe pain, mood swings, frenzy [and becoming] upset real easy."  (Id. at 60.) Winstead testified that her pain symptoms, which she experiences in her neck, back, shoulder, hip, buttocks, and leg, have been worsening since 2008, when she would be unable to rouse herself from bed on average one day per week.  (Id.) According to Winstead, she must lie on ice packs in her bed to treat her pain about four times a month.  (Id. at 61.)

In reference to her various pains, Winstead testified that she could only sit for five minutes at a time and prefers to stand because it "keeps the pressure off" her back and legs, but is only able to stand for 20 minutes at a time.  (Id. at 62-63.) She rated her pain as a seven on a scale of one to ten.  (Id. at 73.)  Winstead

testified that she can only walk half of a city block and cannot carry anything heavier than her purse. (Id. at 63.) According to Winstead, she has difficulty showering, bathing, and getting dressed to the extent that any of those activities involve bending at the waist. (Id. at 70.) Winstead testified that lately she spends her days at home watching television in either a sitting or standing position, and making easy meals like macaroni and cheese. (Id. at 67.) Winstead added that her daughter helps her with the household chores. (Id. at 68.) When asked whether she was able to shop for groceries, Winstead said that she has done so in the past but described an incident in which she abandoned her cart at the grocery store and fled because of a panic attack. (Id.) She testified that she takes Prozac, Xanax, Depakote, Proventil, Advair Disk, Ibuprofen 800, and Flexeril, among other medications. (Id.) Winstead said that her medications cause her to feel "nauseated, shaky, [and] . . . woozy." (Id.)

Some of the ALJ's questions demonstrated her skepticism toward Winstead's assertions. When the ALJ questioned Winstead about her suntan, which the ALJ believed was inconsistent with the bleak testimony about her daily activities, Winstead said that it was from standing outside watching her youngest daughter. (Id. at 70.) The ALJ also questioned Winstead about her unusual choice of footwear to the hearing—flip-flops—in light of her back pain. (Id.) Winstead said that her doctors never told her that flip-flops were inappropriate, and that they in fact told her that "slip-on shoes" were a good idea. (Id.)

The ALJ questioned Winstead at length about alcohol and drug use. Winstead answered that she does not normally consume alcohol, but admitted that she has consumed it since her alleged disability onset date, once to the point of intoxication. (Id. at 64.) Winstead also testified that she used marijuana since her alleged disability onset date but stopped using it sometime in 2010 when the pain clinic began testing her for drugs. (Id.)

## C.   Vocational Expert's Hearing Testimony

A vocational expert ("VE") testified at Winstead's hearing and characterized Winstead's past work as ranging from unskilled to semi-skilled and from light to heavy physical exertion. (A.R. 79.)   The ALJ asked the VE to consider a hypothetical person of Winstead's age and work history who was limited to light work with the following restrictions: only occasional stooping and crouching; no climbing of ladders, ropes, or scaffolding; no exposure to heights or to dangerous moving machinery; only simple instructions and routine tasks; and only occasional interaction with supervisors, coworkers, or the public. (Id. at 80.)   In response to these limitations, the VE opined that the hypothetical person could perform some of Winstead's past relevant work, specifically her work as an assembler and packer. (Id.)   But the VE also testified that the hypothetical person described by the ALJ could also perform other work in the national economy: a hand packer, of which there are approximately 4,700 available jobs in metropolitan Chicago; an assembler, of which there are approximately 5,600 jobs; or a hand sorter, of which there are 2,800 jobs available. (Id. at 81.)

The ALJ then posed a different hypothetical to the VE, this time asking him to consider other jobs in the economy with the same restrictions but at the sedentary level. (Id. at 81-82.) The VE responded that such a person could perform jobs within the manufacturing industry, either as a hand sorter (1,400 positions), assembler (3,200 positions), or bench packager (4,300 positions). (Id.) The ALJ then asked what jobs the same person could perform if she missed one-half workday per week, and the VE answered that such a person would be unable to maintain employment. (Id. at 82.) Finally, the ALJ asked what jobs a person could perform if she were off-task 30 percent of the time, or if she had to take three 30-minute breaks to lie down during a work day, and the VE opined that in neither case would such a person be employable. (Id.)

**D.    The ALJ's Decision**

On August 29, 2012, the ALJ issued a decision finding that Winstead is not disabled within the meaning of the Social Security Act. (A.R. 15-35.) The ALJ applied the ordinary five-step analytical sequence for disability claims, *see* 20 C.F.R. § 416.920, finding at step one that Winstead has not engaged in substantial gainful activity since her disability application date, (A.R. 20). At step two, the ALJ found that Winstead has a medically determinable impairment or combination of impairments that is "severe" within the meaning of 20 C.F.R. § 416.920(c), because she has post-traumatic stress disorder, bipolar disorder, degenerative disc disease of the lumbar spine, and is obese. (A.R. 20-21.) Also at step two, the ALJ found that Winstead has the non-severe impairment of asthma.

At step three, the ALJ ruled that Winstead's severe impairments, individually or in combination, did not meet or equal a listings-level impairment. The ALJ found that Winstead's mental impairments of post-traumatic stress disorder and bipolar disorder, considered singly or in combination, did not meet the "paragraph B" criteria. (Id. at 21.) Claimants are required to prove that they have marked restrictions in at least two of the B criteria, but the ALJ found that Winstead exhibits only mild or moderate restrictions in activities of daily living, social functioning, and in concentration, persistence, or pace. See 20 C.F.R. § 404.1520. In so finding, the ALJ noted that Winstead "independently takes care of her toileting, washing, and personal hygiene," is the sole caretaker of her two children, and further called attention to the absence of any episodes of decomposition. (A.R. 21-22.) Nor did the ALJ find any evidence of "paragraph C" criteria, causing her to conclude that none of Winstead's mental impairments meets or equals a listings-level impairment. (Id. at 22.)

Before considering step four, the ALJ determined that Winstead has the RFC to perform sedentary work. (Id. at 23.) The ALJ also determined that Winstead had the following limitations: cannot climb ladders, ropes, or scaffolding; cannot be exposed to heights or hazards such as dangerous machinery; can only climb ramps or stairs occasionally; and can only occasionally balance, stoop, kneel, crouch, or crawl. (Id.) The ALJ further determined that Winstead is limited to work "involving simple instructions, routine tasks, simple work-related decisions and [only] occasional interaction with supervisors, co-workers and the public." (Id.)

In so finding, the ALJ identified several factors that caused her to disbelieve Winstead's testimony. (Id. at 23.) Among other things that raised her suspicion, the ALJ noted that Winstead's alleged mental impairments are effectively treated with medication and are inconsistent with her activities that include throwing a party and drinking past the point of inebriation, and raising two children, one of whom is disabled. (Id. at 26-27.) The ALJ also pointed out that Winstead's doctors at the pain clinic refused to complete paperwork in support of her disability application. (Id. at 24.) The ALJ further observed that Winstead was released from Parkview Family Practice because she had obtained multiple prescriptions for Vicodin from different providers, had been noncompliant with her own medications, and had missed appointments. (Id. at 26.) In determining that Winstead can perform sedentary work despite her back pain, the ALJ highlighted that Winstead experienced back pain in many of her prior jobs since at least 2002 and continues to undertake activities, such as assisting her husband move tree branches, which someone with disabling back pain would not undertake. (Id. at 29.)

At step four, the ALJ determined that Winstead cannot perform her past relevant work because she is only suited for sedentary work. (Id. at 33.) But at step five, the ALJ found that there are jobs that exist in significant numbers in the national economy that Winstead can perform and specifically identified sorter, assembler, and packager as potential jobs. (Id. at 34.) Based on these findings, the ALJ concluded that Winstead is not disabled within the meaning of the SSA.

## Analysis

Winstead challenges the ALJ's determinations about her severe and non-severe impairments, her credibility, and her RFC. This court's role is limited to determining whether the ALJ's decision is supported by substantial evidence and free of legal error. *See Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence means that "a reasonable mind might accept [it] as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). To meet the substantial evidence standard, the ALJ must build a logical bridge between the evidence and her conclusion, but need not provide a comprehensive written evaluation of every piece of evidence in the record. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). To determine whether the ALJ's decision is adequately supported, this court will not reweigh the evidence or substitute its own judgment for that of the ALJ. *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## A. Medical Determinations

Winstead asserts that the ALJ erred "in rejecting all medical opinions of everyone." (R. 17, Pl.'s Br. at 11.) Winstead further argues that the ALJ erred in her decision to give no weight or only partial weight to seven different medical providers who have either treated or evaluated Winstead at some point over the course of approximately five years. At the same time, Winstead argues that the ALJ gave too much weight to a different physician, that a temporary state disability examination should have been considered, and that the ALJ erred in failing to

gather additional evidence from the providers whose records she found to be lacking in sufficient detail. (R. 17, Pl.'s Br. at 11-17.) The court addresses Winstead's challenges in turn.

First, Winstead argues that the ALJ improperly rejected the opinion of Dr. Hudspeth, who performed an RFC assessment for Winstead in January 2010, (A.R. 631, *et seq.*), because "[t]his examiner was qualified and had access to all the previous files," (R. 17, Pl.'s Br. at 11). But the ALJ did not reject Dr. Hudspeth's RFC opinion outright, and Dr. Hudspeth in fact found that Winstead did not meet the requisite paragraph B criteria that would have supported a finding of disability. (A.R. 641.) Instead, the ALJ gave little weight to Dr. Hudspeth's assessment that Winstead would be "best served by having work assignments with reduced work pressures," and should have no contact with the public and minimal contact with co-workers or supervisors. (Id. at 647.) According to the ALJ, Dr. Hudspeth's findings were inconsistent with Winstead's activities, and also inconsistent with treatment notes showing that Winstead's condition had improved and that she was stable. (Id. at 31.) The record indeed includes evidence showing that Winstead's condition improved after Dr. Hudspeth's evaluation. In particular, June and September 2010 medical records from Dr. Sheth indicate that Winstead was responding well to psychiatric medication and was improving. (See, e.g., id. at 838, 1200.) The ALJ also pointed to other evidence tending to contradict Dr. Hudspeth's finding, specifically that Winstead shops and cares for children by herself, and is the representative payee for her disabled child. (Id. at 30-31.) Given Dr. Hudspeth's

findings about the severity of her claimed mental limitations, it is not clear why Winstead challenges the decision to award little weight to his report, but in any case the ALJ's decision was supported by substantial evidence.

Next, Winstead challenges the ALJ's decision to "reject" Dr. Sheth. But again, Winstead fails to qualify her argument and fails to conform to the facts. The ALJ chose only to afford "little weight" to a particular form completed by Dr. Sheth in March 2010 in which Dr. Sheth opined that the claimant had marked restrictions in social functioning and concentration, persistence, or pace, and that she would miss more than four days of work per month. (Id. at 31.) The ALJ determined that the form should be given little weight because it was completed after only two visits with Winstead, and because Dr. Sheth's treatment notes from subsequent visits paint a different picture of Winstead's capacity. (See, e.g., id. at 838 (noting that Winstead's condition had improved with Prozac in June 2010); 1200 (noting that Winstead's symptoms had improved in September 2010); 876 (noting that Winstead's symptoms had improved in December 2010).) The ALJ also reduced the weight she accorded to Dr. Sheth's March 2010 opinion because other evidence suggested that Winstead was not being honest with him about her activities and drug use. (Id. at 31.) When a physician's opinion is contradicted by his own treatment notes, as the ALJ explained was the case here, the opinion may be discounted or diminished in significance. *See Skarbek v. Barnhart*, 390 F.3d 500, 503-04 (7th Cir. 2004). Evidence that Winstead was dishonest with Dr. Sheth

coupled with later records documenting her improved condition substantially support the ALJ's decision to give little weight to his March 2010 findings.

Third, Winstead challenges the ALJ's decision to give no weight to the opinion of Nurse Hallam. Although a registered nurse is not an "acceptable medical source" according to 20 C.F.R. § 404.1513, that fact alone is insufficient to categorically reject a medical opinion from a treating nurse. *See Voigt v. Colvin*, 781 F.3d 871, 878 (7th Cir. 2015). Nevertheless, the ALJ offered multiple other reasons why Nurse Hallam's opinion should receive no weight, observing that the limitations perceived by her "starkly contrast with the treatment notes from North Central up until that point," and that her opinion was a sympathetic outlier. (A.R. 34.) Indeed, the record indicates that Nurse Hallam reported numerous episodes of decompensation, (id. at 738), while many others found that Winstead in fact had zero episodes of decompensation. The ALJ also drew attention to the fact that other records indicate that Winstead's mental status was normal in December 2009, and that Dr. Sheth kept her medications the same through March 2012, meaning that Nurse Hallam's pessimistic assessment occurred during a time of apparent stability with other providers. (Id. at 31, 722.) In any event, the ALJ succeeded in building the requisite logical bridge, *see Pepper*, 712 F.3d at 362, between the evidence and her decision to give no weight to Hallam's opinion.

Fourth, Winstead argues that the ALJ improperly gave no weight to the opinion of Dr. Cremarius. (R. 17, Pl.'s Br. at 12.) This contention is puzzling because Dr. Cremarius found that Winstead did not have a severe mental

impairment because she did not meet the requisite criteria of paragraphs B or C and had nothing more than mild functional limitation in all assessed categories. (A.R. 1018.) Presumably, Winstead wishes that the ALJ had dwelled upon Dr. Cremarius's observation that "[t]he claimant's allegations of mental impairments are partially credible," but that is speculation on the court's part because Winstead merely states "[w]e cannot even address [the ALJ's] critique as being real." (R. 17, Pl.'s Br. at 12.) That is all Winstead has to say about the ALJ's handling of Dr. Cremarius's opinion. Real or not, Winstead fails to provide any guidance to the court about what she thinks is wrong with the ALJ's treatment of Dr. Cremarius's opinion, runs afoul of her duty to fully develop an argument, *see Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010), and, therefore, waives the point.

Fifth, Winstead challenges the decision of the ALJ to afford no weight to Nurse Luckey, a nurse practitioner who treated Winstead between 2008 and 2012. (R. 17, Pl.'s Br. at 8.) According to Winstead, the ALJ should have given greater weight to a May 2010 Medical Source Statement completed by Nurse Luckey, (A.R. 735-38), opining that she could not stand, sit, or walk for more than two hours at a time. But the ALJ discounted Nurse Luckey's opinion on several bases: first, it was issued prior to Nurse Luckey's discovery that Winstead was lying about her prescription medications; second, it was internally inconsistent in regards to Winstead's mobility, neurological findings, and dexterity, (id. at 1349-1352); and third, Nurse Luckey—like Nurse Hallam—is not an acceptable medical source

under 20 C.F.R. § 404.1513, a point that Winstead does not contest. (A.R. 32.) The ALJ is correct that Nurse Luckey is not an acceptable medical source, is correct that the "full capacity" finding of Winstead's ability to walk appears to be incongruous with other physical findings about her mobility, and is also correct that Winstead lied to Nurse Luckey and others about her drug use. Even if reasonable minds could disagree, the ALJ has provided substantial evidence that Nurse Luckey's opinion should receive no weight. *See McKinzey*, 641 F.3d at 889.

Sixth, Winstead argues that the ALJ should have given weight to a form completed by Dr. Glen Ricca because he found that Winstead had evidence of some nerve root compression, sensory changes, and muscle weakness. (A.R. 31, 1018-1030.) But the ALJ gave no weight to the opinion because Nurse Luckey, whose opinions were given no weight for the reasons already discussed, actually performed the examinations and Dr. Ricca's electronic signature was affixed to it at a later time. (Id. at 32, 1066, 1071.) Therefore, the ALJ's reasons for discrediting Nurse Luckey's findings apply equally to Dr. Ricca's to the extent that she was the author of the record attributed to Dr. Ricca. In addition, the ALJ was troubled by the notation that Winstead was suffering side effects from her medication when those claimed side effects are scarcely observed elsewhere in the record. (Id. at 32.) The ALJ also pointed to the fact that the examinations also indicated that Winstead had normal neurological functioning. (Id.) These reasons, in conjunction with the fact that Dr. Ricca's opinions appear to be the work of Nurse Luckey, constitute a substantial basis for giving the form no weight.

Seventh, Winstead observes that in April 2012 Dr. George DePhillips checked a box on a form called a "Disability Certificate" that Winstead was "totally incapacitated," until further notice. (Id. at 1385.) The ALJ gave no weight to this opinion because there are no treatment notes and nothing else from Dr. DePhillips to explain this conclusion. (Id. at 32.) The Commissioner highlights this same observation and argues that Dr. DePhillips made his notation without any examination of Winstead at all. (See R. 25, Govt.'s Br. at 11-12.) Moreover, the ALJ identified the apparent lack of any sort of examination as another reason why the opinion carried no weight, especially viewed in context with other treating sources who believed that Winstead had normal neurological functioning in the same time frame. (Id.) Finally, Dr. DePhillips told Winstead that her disc protrusion did not explain the pain she claimed to experience radiating below her right knee. (Id. at 1335.) In this case, the ALJ permissibly determined that the medical evidence failed to support the conclusion of Dr. DePhillips. *See Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (explaining that ALJs are entitled to determine that medical evidence fails to support the conclusions of a physician).

Eighth, Winstead argues that the ALJ gave too much weight to State Agency Consultant Dr. Charles Kenney and misunderstood his observations. According to the ALJ, Dr. Kenney's September 2011 opinion was consistent with the medical records, viewed as a whole, and he determined that Winstead had normal neurological functioning. (A.R. 31.) Winstead argues that the ALJ mischaracterized Dr. Kenney's opinion as being supportive of Winstead's ability to

perform light work. (R. 17, Pl.'s Br. at 14.) In response, the Commissioner cites case law supporting the ability of an ALJ to rely on state agency medical consultants. (R. 25, Govt.'s Br. at 12.) Winstead is correct that there is a discrepancy between Dr. Kenney's finding that she could sit for six hours and stand for two hours per day, and the ALJ's characterization of that finding that she could "perform light work." Typically, light work requires "a good deal of walking or standing," *see* 20 C.F.R. § 404.1567(b), whereas sedentary work only requires occasional standing and walking, *see* 20 C.F.R. § 404.1567(a). But this error was harmless because the ALJ's opinion is nevertheless consistent with Winstead's ability to perform sedentary work, which still does not support a finding of disability in this case. *See Spiva v. Astrue,* 628 F.3d 346, 353 (7th Cir. 2010) (explaining that remand is a waste of time where it is "predictable with great confidence that the agency will reinstate its decision . . . because [it] is overwhelmingly supported by the record"); *see also Zalewski v. Heckler*, 760 F.2d 160, 163 (7th Cir. 1985) (affirming a finding of no disability where the claimant retained the ability to perform sedentary work). In light of the fact that the ALJ ultimately limited Winstead to sedentary work in her decision, (A.R. 33), her confusion between light and sedentary work in Dr. Kenney's RFC was harmless.

Ninth, Winstead briefly argues, (R. 17, Pl.'s Br. at 14), that the ALJ should have considered the State Department of Human Services determination that she was eligible for Medicaid benefits on a temporary basis. (A.R. 1440.) The ALJ rejected this argument because it was not a medical opinion, did not contain a

function-by-function assessment, was temporary, and was rendered using different standards than those employed by the Commissioner. (Id. at 33.) Because the Seventh Circuit has made clear that ALJs are not bound by other governmental agency findings about a claimant's disability, *see Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000), this argument fails.

Lastly, Winstead argues that the ALJ mishandled numerous medical opinions that she found unconvincing because, if the ALJ thought that a provider's records were incomplete or inconclusive, she had an obligation to contact those providers to secure adequate information. (R. 17, Pl.'s Br. at 15.) The Commissioner points to the nearly 1,500-page record, and argues that the ALJ only has the duty to contact medical sources when the record is not adequate to determine whether a claimant is disabled, and that the ALJ gave "sufficient reasons" for weighing the medical opinion evidence the way she did. (R. 25, Govt.'s Br. at 12.) Here, *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004), is on point: "[a]n ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." Winstead's record is approximately 1,500 pages long, more than 900 of which are medical records from many medical professionals who have treated or evaluated her since 2008. Not surprisingly, the medical reports have varying levels of detail. But many pieces of evidence cut against Winstead's disability claim, and the ALJ has "an affirmative responsibility to resolve . . . conflict[s]" within the medical opinion evidence. *Bailey v. Barnhart*, 473 F. Supp. 2d 842, 849 (N.D. Ill. 2006) (citing *Stephens v. Heckler*,

766 F.2d 284, 287 (7th Cir. 1985)).  Because the ALJ abided by that responsibility here, the court finds no reversible error in her treatment of the medical opinions.

## B.    Credibility Determination

During her hearing testimony, Winstead's characterization of her symptoms was essentially a description of a largely homebound person who requires assistance with shopping and simple household chores.  The ALJ did not believe Winstead's testimony. Winstead must surmount the special deference this court extends to ALJs' credibility determinations, on account of their ability to personally observe claimants testify.  *See Castille v. Astrue*, 617 F.3d 923, 928-29 (7th Cir. 2010).  In practical effect, this deference means that "[r]ather than nitpick the ALJ's opinion for inconsistencies or contradictions, [district courts] give it a commonsensical reading" and reverse only those credibility determinations that are "patently wrong."  *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).  Against this deferential standard, Winstead takes issue with the ALJ's reliance on evidence in the record tending to show that Winstead deceived her healthcare providers about her drug and alcohol use, deceived her healthcare providers into giving her more prescription drugs than any of them knew she was taking, and understated her social abilities at her hearing.  (R. 17, Pl.'s Br. at 11.)   Winstead advances three points of disagreement: first, a piece of information she believes was extraneous in the determination; second, a factual error about the chronology in one of the ALJ's statements about Winstead's dishonesty with her providers; and third, the ALJ's

reliance on a telephone call suggesting that Winstead was selling her prescription drugs to support a marijuana habit. (A.R. 10-11.)

Preliminarily, Winstead is correct that one of the pieces of evidence identified by the ALJ—the party that Winstead hosted at her house in the summer of 2008—predates her alleged onset date of disability. (Compare id. at 30 with id. at 553.) This, however, should not be confused with the party that Winstead attended where she drank to the point of inebriation. The court therefore analyzes the credibility determination to determine whether the ALJ sufficiently identified other evidence that could support an adverse determination. Taking Winstead's arguments in order, Winstead's dishonesty with her healthcare providers about her substance abuse, and in particular her concerted efforts to deceive them into prescribing her multiple and overlapping authorizations for Xanax and Vicodin, that she in turn may or may not have sold in exchange for marijuana or cocaine, has bearing on her credibility.

The ALJ identified ample evidence that Winstead was not credible. First, the ALJ observed that Winstead told treating providers that she had not had any illegal drugs since experimenting as a teenager, (id. at 30), but Winstead herself contradicted these statements by admitting to drug use into 2008, (id. at 63). And, although Winstead testified that she had not used any marijuana in two years and had never used other illegal drugs, (id.), a positive drug test for cocaine and marijuana in April 2010 suggested otherwise. But perhaps most significantly, the ALJ observed that a caller identifying himself as Winstead's fiancé notified her

physicians that she was selling her prescription medications in exchange for marijuana. (Id. at 30.) Acting on this tip, Winstead's providers confirmed that she filled three different Vicodin prescriptions from three different physicians within the span of two weeks. (Id. at 1351.) Winstead appears to argue that the caller was not Winstead's fiancé, but was instead an anonymous person who presumably had some animosity toward her, (see R. 17, Pl.'s Br. at 11), but it is difficult to understand why that matters. The caller was correct that Winstead was deceiving her physicians in order to obtain surplus prescription drugs. Dishonesty with medical providers in order to access drugs plainly supports an adverse credibility determination. *See Rogers v. Barnhart*, 446 F. Supp. 2d 828, 851 (N.D. Ill. 2006).

With respect to Winstead's activities of daily living, the Seventh Circuit has cautioned ALJs against weighing these professed factors too heavily in making their credibility determinations, *see Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012), because limited activities such as dressing, bathing, walking, and shopping do not necessarily mean that a person is capable of gainful employment. Winstead's hearing testimony portrayed a person who is essentially homebound, watches television all day, and is only able to clean, cook, and shop occasionally, relying on her children and others for additional support. (A.R. 67-68.) But the ALJ observed that Winstead nevertheless applied for and received unemployment benefits during the same period in which she is alleging an inability to work. (Id. at 31.) Winstead is also the primary caregiver and payee for her disabled daughter. The ALJ also observed, (id. at 28), that Winstead attended a party where she became inebriated

in August 2010, (id. at 890). Winstead might be right that she was not dishonest about everything she told the ALJ, but her arguments are essentially requests for this court to review that evidence de novo and to reach a different conclusion, which this court cannot do. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). There is nothing patently wrong about drawing adverse credibility inferences against a claimant who lies to her healthcare providers and whose testimony conflicts with other evidence about her abilities and habits. In other words, the ALJ's credibility determination against Winstead may not have been flawless, but then again it did not have to be, *see Simila*, 573 F.3d at 517, because it was supported by many other pieces of evidence and was not patently wrong.

## C.     RFC Assessment

Finally, Winstead challenges the validity of the ALJ's RFC determination as "incomplete." (R. 17, Pl.'s Br. at 15.) To properly evaluate a claimant's RFC, an ALJ is obliged to consider all relevant medical and nonmedical evidence, and must provide a narrative discussion explaining how that evidence supports her conclusion. *See* 20 C.F.R. § 404.1545(a)(3). The execution of this task requires ALJs to grapple with "all limitations that arise from medically determinable impairments," *Villano v.* Astrue, 556 F.3d 558, 563 (7th Cir. 2009), but does not require a complete written evaluation of every piece of evidence in the record, *Pepper*, 712 F.3d at 362. Rather, the ALJ's RFC must include only those limitations that the record supports. *Schmidt v. Astrue,* 496 F.3d 833, 845-46 (7th Cir. 2007). However, this court's review of the ALJ's factual findings is deferential, and the

decision will be affirmed "if substantial evidence supported the decision." *Jones v. Astrue*, 623 F.3d at 1160 (citing 42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673).

Winstead argues supposititiously that "if the ALJ had accepted the opinion of Dr. Hudspeth that she could have no contact with the public and minimal contact with co-workers and supervisors and work with 'reduced work pressures,'" and if the ALJ had also accepted the impressions of Nurse Hallam, and if all of these additional limitations had been posed in the hypotheticals to the VE, the outcome would have been different. (R. 17, Pl.'s Br. at 15-16.) But the Seventh Circuit has explained that "[a]ll that is required is that the hypothetical question be supported by the medical evidence in the record." *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987). And, as previously discussed in this opinion, the ALJ offered legitimate bases for rejecting the evidence that Winstead now argues should have been incorporated into her RFC. Moreover, the hypothetical person described to the VE had numerous restrictions: a high school graduate who could only occasionally stoop and crouch; could never climb ladders, ropes, or scaffolding; could never be exposed to heights or dangerous moving machinery; had mild restrictions in social functioning and moderate restrictions in concentration, persistence, or pace; and could only perform simple instructions and routine tasks involving only occasional interaction with supervisors, coworkers, and the general public. (A.R. 79-80.) Each of these limitations is supported in multiple places in the record, and the VE concluded that thousands of positions were available in the Chicago metropolitan area to a person with those limitations. (Id. at 80-81.)

## Conclusion

For the foregoing reasons, Winstead's motion for summary judgment is denied and the Commissioner's granted, and the final decision of the Commissioner is affirmed.

**ENTER:**


_____
**Young B. Kim**
**United States Magistrate Judge**